Good morning, Your Honors. May it please the Court, my name is Katherine Kimball Windsor. I represent Rafael Yepes, and I'm arguing today on behalf of Mr. Yepes and also on behalf of all nine appellants. I'd like to reserve five minutes for rebuttal and I'll keep an eye on the clock this morning. We were last here for argument in this case ten years ago in December 2015. This Court remanded for fact-finding on the Brady-Giglio issue surrounding informant Victor Bugarin, who at the time we were calling Victor Bulgarian. And we're back after about six years in the District Court. I expect to focus today on materiality, which is the prong of the Brady-Giglio case that, or a test that we lost in the District Court. But I thought it would be helpful at the start to review what we've learned about Bugarin since we were last here and what we haven't learned. And that certainly interplays with the materiality argument as well. So in terms of what we've learned since we were last here, we now know his name. There were a number of different variations that were used in the District Court. He testified under the name Victor Bulgarian. We know that he was working as a paid informant in multiple cases for multiple agencies before the 2006 trial. The District Court found that in its order. And this case was a launching pad for what has turned out to be a lucrative career as a professional informant. We also know that his motivation for becoming an informant was payment. And that he was working for the ATF and giving information prior to his receiving payment. We also have evidence that he used illegal drugs. And there was evidence that law enforcement felt he was not forthcoming and provided selective information. Defense counsel did not know this. The jury did not hear about it. And the District Court correctly found that there was favorable evidence that he was suppressed. What we haven't learned is, we haven't heard from Bulgarian himself. When we were last here, the issue that plagued us was that his testimony at the second trial, the 2009 trial, about the benefits that he received, differed quite a bit from the government's accounting. If anything, that gap has gotten wider because the government's accounting for what they paid, Bulgarian, has gone down. It's true that he didn't know for sure what he'd been paid, but he said confidently that he'd received $80,000 and possibly more, possibly much more, even up to $200,000. And the jury heard him say that? Yes. Well, in the second trial, he testified to that. At our trial, there was no evidence that he'd received money at all. Well, wait a minute. Yes, there was. He testified that he'd received some money from the government? At the first trial? No. At the first trial, the issue is... Wasn't there the $5,000? Well, there's the relocation, but in terms of... That's money, counsel. You just said that he... I think that the jury did hear him testify that he had received some relocation funds and they paid for his hotel. So I don't think it's correct to say there was no evidence of that. I think he originally denied anything and the government had sent a letter indicating, which is a clearly erroneous letter, and it was described as an egregious mistake. I think there were 130 witnesses at this trial, though, and the government took responsibility. I'm really doing this so that you can tell me what I'm missing. My understanding is that that mistake was made and that the government took responsibility for it right away, which was good because this is a serious mistake, but that right there, the jury learned that there had been some payments to him in exchange for his testimony. Can I just finish? Sorry. And I think the jury... Maybe it would be helpful to know what the jury did hear. I have a list here. But they knew that he was testifying as a cooperator and they knew that he had received consideration for charges that he faced significant jail time. The jury heard that, right? Yes. I would quibble with the word that he was a cooperator. He had been a cooperator and he'd already been sentenced in that prior case. It was a little unclear how he'd ended up testifying at our trial, which was what the defense counsel was trying to get at. But why don't you tick off what you think the first jury heard and I'm going to see if it matches my list. Maybe I'm missing something. The first thing I wanted to say just to respond to the question about whether he'd been paid. And I think the distinction that is really important is whether he had received money for information or for his work in the case. What they'd heard is that he had received some funds to be relocated because his life was in danger. I mean, this was not a benefit to him that the government had paid to relocate him. So that is a really different thing than being a paid informant, which is something that this court has recognized as being really powerful impeachment information. Forgive me for misspeaking, counsel. I know the difference. So if you could move on. Your time is ticking away and I want to make sure you get to the most salient points. Can you tell me what you think the first jury heard? You mean in terms of impeachment material? Yes. Yeah. So they I mean, they heard that he had been granted immunity, right? They heard that he had cooperated in this case in 2004 and he'd been sentenced for that. So he wasn't receiving any further benefit from that at all. They heard that he'd been a drug dealer who'd worked with the Mexican Mafia and that he had been involved. He had he had considered murder, right? He hadn't done that. And so he had talked with the Mexican Mafia about trying to murder someone. Yes. But he didn't. I mean, ultimately, he decided that he wanted to wash his hands of it and I appreciate that. But I'm we're talking about impeachment and the jury knew these facts, which are certainly impeaching fact, powerfully impeaching facts. Well, I what what I would say is that this court and the Supreme Court has always treated being paid money as an informant as being very powerful impeachment evidence. It's in a different category. And in particular, when there's some unknown, when you're when the person is testifying and cooperating and they don't know whether they're going to be paid. And that's what we had here, because he said at the beginning his motivation was payment. And so that's this is qualitatively different from any of the other impeachment that they'd heard. When you read this testimony, you can tell that the defense lawyers are are stymied. They cannot figure out why this witness is there. What's his motive? There's a motion that's filed over the weekend where the defense counsel is saying there's got to be some more information out there about this. You know, we're entitled to to Brady evidence. We we think there have to be has to be more to this than what meets the eye, because he was giving some powerful and, you know, really important, you know, striking testimony that the defense lawyers thought was false. I mean, he testified that he was running these prisons from the outside, which the defense expert later said wasn't possible. And so the defense the all of the defense lawyers were trying to figure out what was going on. And when you I mean, I think the most disturbing part of the testimony is at 11 ER 2378, where on cross examination, the lawyer, the defense lawyer says, have you worked any other cases for the state or federal government? And he says no. When they ask how many cases did he cooperate on? He says one. And the lawyer says just one. And he says just one. And he says any money besides getting any besides getting the benefit of no jail time and probation. Did you get any money? And there's an objection that's overruled. And the witness says, no, I don't know. And so that I know the government is saying that the witness misunderstood the questions, but that gave the jury the wrong impression that he hadn't received any money for being an informant, which is different from receiving those relocation funds. Okay. So I appreciate that argument. Your position is that there was more that should have been disclosed and that he would have been further impeached. His credibility would have been further impeached had that been available to the defendants. What I'm less clear about at this point, my colleagues may have lots of other questions, but can you explain to me why this witness was central to the government's case as to any of the defendants? Yes. Well, so this court has talked about how we should listen to the prosecutor. And the prosecutor says at 21 ER 4813, the witness was crucial to the government's case. As a former high-level operative of the Mexican Mafia who dealt directly with the VBS gang, he was able to identify members of the VBS gang, including several defendants, and to further identify several members as gang leaders. He was also able to testify regarding the Mexican Mafia's taxation of the VBS gang, a key issue at trial, and to internal power struggles within the VBS gang that directly led to the murder of one of the VBS's leaders. And in the Kyle's case and in this court's case in Sedegatti, the court says that the court wrote, it's ironic that when arguing the witness should be allowed to testify, the government deems her critical. But in its appellate brief says she's a minor witness. That's a really similar thing here. The government said she was critical, or he was critical, and we know that he was a critical witness because it was the focus of closing 17 times. In the Sedegatti case where they also, this court also found that the witness gave material was material, the Brady violation was material, the government had named that witness four times. Here we have 17 times. It's the focus of the government's argument. It's the focus of the defense's argument. And this court rejected the government's argument in the first appeal. It was making a very similar argument that Asensio and Agent Evanella had given duplicative testimony. And this court said, no, that you can't satisfy Brady by making some evidence available and claiming the rest would be cumulative. And while some of Bulgarian's testimony was independently corroborated, it nonetheless played a substantial role in the government's case in chief to show that VBS was a criminal enterprise under RICO. And what I would say is there was certainly evidence that VBS existed as a gang, that it had, members had tattoos, that there were, there was graffiti that they did. They had occasional meetings. There was also evidence that our clients were drug dealers, that they were selling drugs. There wasn't, it wasn't, it was, you know, there were, some people were very small dealers. Some people were dealing larger amounts. But there wasn't a connection to this whole conspiracy until Bulgarian comes in and says, the Mexican Mafia has made a list of all the drug dealers in this gang, and we've met with the leader of the gang, and we, you know, we figured out that they need to pay taxation 20 percent of what they're earning. All of a sudden we have this cohesive unit, which is not what the evidence. And you think there wasn't other evidence? All but two were members of the gang, right? Of our, of the appellants here? Yes. I think, I mean, one of the elements is they either, everyone has to either be a member or an associate. So in our group there were some associates as well. But that, you know, there can be members of a gang, but for the, to prove a RICO, you have to prove that connection, that this is conduct that's part of a racketeering enterprise. And that's what the government used this testimony to argue in closing. It's why it was so important. I understand how they use it. What I'm trying to figure out is, is it your contention this is all they had to prove this part of their case? This was the only, this was the only- There were a lot of recordings. What about the recordings? I suppose we're going to hear from the government in a minute. But just what's your take on this? Why was this so central as opposed to the other evidence that the government offered? Well, as, I mean, as you said, this was, there were a lot of witnesses at this trial, and there were days of testimony that would only concern one appellant or really wouldn't concern any of the appellants. I mean, we started this, the case started with the murder of Officer Pavelka, which is a terrible tragedy. Our clans were not involved in that. And it, honestly, it was really the rogue acts of, of two members of the gang. It was very, it was powerful evidence, of course, but it didn't show the gang working as a cohesive unit. There was, there were evidence of drug deals, but there wasn't evidence of this one conspiracy that was charged in count three, as opposed to multiple conspiracies. So Bugarinus is the witness who brings the VBS gang together as an entity and shows it working in terms of one drug conspiracy, you know, as, as a whole group together, as opposed to just these little drug sales and, and smaller conspiracies, we might call them, that are happening. He, he has the gang working as a cohesive group. And so that's why, I mean, it was material to counts one, two, and three. And I, you know, and also to, in terms of quantity to the, to the, the sentences, because two of our clans are serving life sentences because of these 851 enhancements that are no longer life sentences under current law. They're, they would be looking at ten year mandatory minimums as opposed to life, to mandatory life where they sentenced today. So that, those quantity determinations were really huge as well. And that's, that's the, the argument on count three, the drug conspiracy. So I, I, I think I'll reserve the rest of my time. Yes, thank you. Good morning, your honors, and may it please the court. William Larson for the United States. The district court in this case correctly found that the undisclosed benefits prior to the 2006 trial of these defendants were far less than the defendants had speculated, far less than Bugarin himself had guessed in a later 2009 trial, and far less than this court had assumed and found, if substantiated, would be material in the prior direct appeal. The district court, in a thorough 14-page order, same district court who sat through both the 2006 trial of these defendants and the 2009 trial of Horatio Llapez, found that the undisclosed benefits were not material to any of the defendants and any of the counts. Now, Brady issues are serious. The government takes this very seriously. Should never happen. But... Isn't the government arguing that it need not have produced some of this material after all? So the government's argument is that on the first two Brady prongs, as to what the court's referring to, is as the first two Brady prongs, the defense hasn't met its burden to show that each piece of undisclosed evidence that was later found on remand was actually in the possession or the constructive knowledge of the development agents. Why not? Why not? I don't understand that. The government has an obligation, you know this, the government has an obligation to produce what it has in its possession or what it's able to, I'm paraphrasing, but what it's able to get, and the government certainly knew that there had been state cooperation here. That's right. The government, the relevant, so the relevant unit is the... And the government affirmatively represented that this person hadn't been paid anything. This is an error. And I think with 130 witnesses, it's certainly an error, it's an unfortunate error. I was impressed that the government took responsibility right away. Absolutely. Not as impressed that on appeal the government seems to be backtracking somewhat and suggesting that this need not have been produced, to be candid. So what's the story with that? And to be very clear, Your Honor, we're not saying all of this should not have been disclosed. Absolutely, it should have been disclosed. But as to the evidence that was in the state's possession, why wasn't there an obligation for you to produce it, sir? It's as to specific payments that the federal, that the prosecution team just was not aware of, and that the defense has not shown the prosecution team. But you know what the standard is about becoming aware of. Absolutely. Absolutely. And in those cases, I just think there hasn't been a showing that the relevant federal agents had access to this, for example, the specific, you know, the $500 payment that Santa Barbara had. Well, forgive me for being, giving you a hard day, but why wouldn't they have had access? Because... They knew about it. Because... They knew about the, there'd been a, I think a DEA task force, and there'd been earlier cooperation. And so I was disappointed to see the government was pushing back and saying it didn't have an obligation to check that out. I understand, Your Honor. And I, what I, to be clear on exactly what our argument is, it's have, you know, it is about the burden and the burden on the Brady claim, and not necessarily that, you know, in all cases, if we went back to 2006, would we go take these steps and find out? Absolutely. That's something we take very seriously in all our criminal cases. And that's not something we shy from here. Okay, so what is your argument? I appreciate that. Thank you. So what is your argument? It's that the defense hasn't met its burden to show, and sort of as a technical matter about who the members of the prosecution team, did they have access to these databases that ultimately showed the payments. Right, and so I just ask, why wouldn't they have? Why wouldn't they have had access to reach out to the state and say, hey, this is... Because these case agents weren't part of this particular task force, as I understand, that had access to the payment records. I think it's a minor point, and I think... You want to move on to your next argument? Yes, Your Honor. Uh-huh. I'm just trying to answer the court's question. Okay, I appreciate that. So I think materiality is really what this case came down to below, and likely what it comes down to in this case. Just to start, unless the court has any questions about the mandate or the law of the case questions, I'll just move directly into substance. So parties agree this is a count-by-count analysis. That's what this court directed the district court to do. We have several dozen counts. I think as a question of whittling those down, Bogarin could not possibly have been material to defendants and counts. He said absolutely nothing about it. So I think that resolves 80 to 90 percent, if not more, of this appeal. Well, what opposing counsel is arguing is that he was critical for the whole RICO enterprise theory. Right. And he testified about, I guess, calculating the taxes due to the Mexican mafia and so on. And all of these folks were charged with drug trafficking. They weren't all charged with RICO, but they were certainly all charged with drug trafficking. And so he purported to have intimate knowledge of the drug trafficking activities. Isn't that fair? I think it's fair to say that he was a RICO witness. I would agree with that. Okay, and so what do you do about, forgive me, but I think if I get this out, then you can answer both. Opposing counsel makes a fair point with the government described this witness as being crucial or central. So let me respond first to the government statements. I think there's two of them that defense relies on and relied on today. There's the statement at, I believe it's 21 ER 4183, which came in a statement by the prosecutor trying to get benefits after the trial for Bagaran to relocate. And so this is a context where the prosecutor had a burden to show that this was important testimony in order to obtain those benefits. I don't think that That's the context in which the prosecutor made those statements? Exactly. Yes, precisely. And so I don't think that can take the place of the district court's judgment or this court's judgment about materiality in a constitutional sense of the testimony to individual accounts. I think he's trying to protect his witness and that's a laudable thing, but I think that statement can only mean so much. Now the statements in closing I think are different and I would ask the court to look at them because I think they're being represented not completely accurately. The quote in closing that has been presented in the defense brief is to say that Bagaran's testimony was important. That's not actually what he said. The context of the discussion was the murder of Eugenio Cruz and the sort of history of the Vineland Boys gang and the sort of struggle for control of the gang. And the prosecutor says Bagaran's testimony was important here. Not important to the case, not important to the drug trafficking, not important to the RICO. Important here talking about this understanding how the gang power struggle sort of developed over time. You mean the Cruz episode, the discussion to murder Cruz? When you say here, I still don't know what you're talking about. The murder of Eugenio Cruz, which was part of the 2009 trial of Horatio Upis. Alright, I did not count the number of times in the closing and I'll certainly re-review it, but that's what I'm hoping you're going to respond to. You think that the characterization was not accurate? I think that's right. Are there other places in the closing where I'll find that he was mentioned again? I think he is mentioned in some other locations, but what I would point the court to is the government's reliance on the other cooperating witnesses, both in closing and in the case in general. And in particular, the defense discussed Anthony Asensio, who is a cooperating witness that we've relied on to show much more detailed testimony about the Vineland boys and about the gang structure and drug trafficking activities. We also, in our 28J letter... And did he identify the members of the gang? I believe Asensio identified Rafael Rapiz and defendant Contreras. Other cooperators testified and identified other members... And drug trafficking deals? Yes. And so in particular... Is there any other place they would have had, other than the individual recordings, how did the, for sentencing, did the judge put together or the government put together its case regarding quantity? You know, I'm not sure regarding sentencing exactly what was relied on for the quantities. The jury made, of course, some quantity findings in the verdict forms. But I just want to make sure that I point the court to the other cooperators. Okay. This idea that Begarin sort of gave the inside view and established the structure of the Vineland boys and made it one enterprise is just not borne out by the trial at all. So I would point the court to Asensio, who testifies in the 16th volume of the supplemental excerpts and I'm happy to provide pages. James Roberts, I think, is another cooperator who provided significant gang history and rules and click testimony. I'd also point in particular because Begarin only talks about Rafael Ipiz and Manuel Ipiz. Bruno Vazquez, who's in the 14th volume, and Julio Razo in the 17th volume, both specifically go into drug trafficking. Bruno Vazquez identifies both Rafael and Manuel Ipiz as Vineland boys members who are engaged in drug trafficking. Julio Razo specifically as to... I believe that may be Meza, but I'll have to double check as to him. So there were significant cooperators, much more significant than Begarin, because remember Begarin was not a member of the Vineland boys. These other cooperators were. And so they are the ones who gave that inside view and who brought it together as one enterprise, as counsel put it. And then just to address the question on the drug quantity that your Honor alluded to, in terms of relying on Begarin's testimony about the taxes, I think if you consider what he actually said about the taxes, that it was $1,500 a month or $2,000 a month. I believe that was 20% of what he estimated. That's actually a pretty low estimate relative to the amounts that were borne out on the wires. Because ultimately if the court goes through the trial testimony, this is a wiretap case and it's structured around the case agent presenting wiretaps, explaining them, police officers discussing some of the seizures that happened because of those wiretaps, and then cooperators sort of filling in the gaps, particularly the cooperators they named. So the quantities are by and large coming from the defendants themselves talking about 50 kilos of cocaine or 90 kilos of methamphetamine. There's significant seizures in this case that we discussed in our brief. So I think the idea that the jury disbelieved all of the defendants' own words about the huge quantities of drugs they were trafficking, and disbelieved all of the other cooperators who were actually members of the gang, and said listen to this guy who I think defense counsel in the reply brief said gave sort of fantastical testimony about running prisons from outside of them, that they believed that as to the drug quantities, but not everything else is just not borne out by the record. Just briefly on the evidentiary hearing point, district court has significant discretion in whether to hold an evidentiary hearing and did not abuse that discretion here. The decision based on materiality just does not turn on any of the disputes that defendants raise in the opening brief or the reply. So unless the court has questions about it. I do have more questions if you could. I want to go through my list to make sure that I understand what the first jury, well the jury heard, and then what was discovered later. I think they knew that he had been arrested in 2004 for possession of a pound of meth and a gun. Correct. Okay. And that he had cooperated and received, did he, a very favorable deal, did they know he had been, the amount of time he thought he was facing, 11 or 12 years? They did. And that he got no jail time? Correct. They learned that in cross-examination. I just want to know if the jury heard it. Yes? Yes. Okay. So then he, did they know that he had cooperated with the California Bureau of Narcotics? I believe Bureau of Narcotics is specifically named. If not BNE, then specifically the detective John, Detective Dutcher is named. Okay. And that they paid for his hotel for whatever that's worth during part of the trial and the $5,000 in relocation expenses. Correct. And then he said that he wasn't receiving any benefits from law enforcement for testifying during the first trial. Correct. Did they hear anything about him wanting favorable consideration for his brother at the first trial? They did not. And I'm happy to address that in particular. Not yet. Yes. Did they hear anything else about what had been impeaching in that first trial? I just want to make sure my list is complete before you go on. They did hear about the brother and the fact that the brother was serving a significant sentence. I believe he was asked and denied whether his testimony would impact the brother, if I'm recalling correctly, and he said no. But that's true. His brother had been sentenced in, I believe, 1999, so six years before the trial. And there's been no evidence in the record that this testimony could have in any way impacted that state sentence. Is there anything else in the list of what the jury did here? I think in addition to the sentencing consideration, which is perhaps the most significant, it's also that he was granted immunity. I mean, just having done gang trials, that's extremely significant in a jury's consideration because they look at this guy. And they heard the testimony that he had been willing to cooperate with the Mexican mafia to try to plan to murder someone, right? Correct. Is there anything else? I think you've got it. He also did not use banks and hadn't been paying taxes. I think that was disclosed as well. Okay. And then what was learned later, an additional $5,000 in relocation expenses was paid in connection with the Vineland Boys trial. So there was the additional $5,000 that was learned later that was before 2006 was not in relation to the Vineland Boys trial. After the Vineland Boys trial, there was an additional $3,600 in relocation payments that were related to the Vineland Boys trial. Okay, wait a minute. At the second trial, it was learned. Well, I want to include not just what was learned at the second trial, but after the investigation, all in, what was not disclosed. I know the $400 from ATF, the $660 from the California Bureau of Narcotics, the $60 from the Santa Barbara Police Department, and then his brother was given consideration at a sentencing even though he was unhappy with it. So I think I have those I think are pretty well uncontested in the briefing. I think there's a $400 payment from ATF that's not disclosed. Yeah, I mentioned that. And so it sounds like I need clarification on the first bullet point that I have in my notes. So the jury heard about the $5,000 relocation payment that was related to Vineland Boys. The additional $5,000 relocation payment that was discovered in the remand investigation was unrelated to the Vineland Boys. Oh, it's unrelated. Yes. Okay. But had he already received it? He had already received it. At the time of trial. So he testified dishonestly about that, or at least incompletely. I would have to look at the specific question. Well, chronologically, it had happened, and the jury didn't hear about it. Fair? Correct. But I think he was asked if he had received any money, and then he sort of says no, and then he's like, well, I remember, oh, they paid for my housing, and then how much, and then $5,000. So I think the how much was about that $5,000 payment. All right. I don't know if he was specifically asked anything where. Fair enough. I don't mean to be elaborate. Is there anything else that you think I should have on the list of what was discovered after the trial that we're talking about today, the 2006 trial? Yes. I think the most important thing that Your Honor didn't mention, that is part of the district court's factual findings and reflected in the decision below and also corroborated by the agency records, is that Begarin had been deactivated prior to his testimony as a CS and had not actively worked as an informant for the state agencies for 10 months before the trial. Is that meaningful to the jury? It's not necessarily. Well, it's responsive to the defense argument, which is that, so in 2009, Begarin says, I have this relationship. I use the government as my ATM. I work whenever I want, and they pay me. Right. And so the argument the defense has been making in this case is he had that same arrangement in 2006. That's just not true. It's just not corroborated. I appreciate that. Again, I'm focusing on what the jury heard and what difference it would have made. Yes. And so, if any, and so I appreciate your clarification, but I don't think it goes on my list for the reasons I just mentioned.  Okay. Is there anything else from you?   Judge Smith, do you have questions? No questions. I don't think the panel has any additional questions. Thank you for your argument. Thank you, Your Honor. We'd ask the court to confirm. I'm right on up. Thank you. I wanted to talk about that list, about what the impeachment that the defense did have, and I'd really like to push back on the idea that there was much impeachment. I mean, none of it was landing. He had cooperated, but he'd already been sentenced. He wasn't getting anything more. All of the other stuff, it didn't explain why he was there that day, and that his motivation was payment. This is the unusual case that we actually know, because he told the law enforcement agencies that his reason for becoming an informant was that he wanted to get paid. That's really unusual, and that's really powerful information, impeachment information, that the defense didn't have, and the jury didn't hear it. Instead, the jury was, the impression from his testimony, when you read the whole thing, was that he had been involved in crime and had really become disillusioned by what had happened in this case. It was riveting testimony about how he tried to prevent the murder of his friend, and then his friend had been murdered, and he had washed his hands of the whole thing, and the impression was that he had left it all behind, when actually he was a paid informant in multiple cases for multiple agencies. I just wanted to point the court to 21ER4778. It's this log that was taken by this joint task force. The first thing you can tell is just how informal the record-keeping was. These were just agents writing down amounts of money. But you can tell he's cooperating. There are different case numbers here. There's money expended. The first two are $260 payments that they say are for info, which the government didn't turn this over to us because they just told us that $60 for info were expense reimbursement. This court has been very suspicious of that claim for expense reimbursement, when there's no receipts and it's these round numbers. It's honestly the same thing with the relocation fees. Twice he got these before our trial. He got $5,000 relocation fees. One was supposedly in a different case. One was in this case. There's no explanation for what that is. You're a really good lawyer, and you have an excellent grasp of all of the facts. What I'm concerned about is I think you made a good showing that the government failed to disclose what it was supposed to, but I still struggle with the prejudice aspect of this. Can you address that for me, please? I failed to see it. Where's the prejudice? Yeah. Well, I mean, my friend on the other side just listed a bunch of other cooperating witnesses. And if you look at every single one of those, they are really different. They gave much less impressive and important testimony to the enterprise. Bruno Vasquez and Julio Rosso are not VBS members. They were people who were dealing drugs with some of the members. They weren't talking about the gang working in this structural way. They were talking about drug dealing. Bruno Vasquez and Anthony Asensio were members who had no contact with the Mexican mafia. And I get all that. Again, where's the prejudice? You've got to show prejudice in addition to the earlier prong violations. Do you not? Yes. I mean, in the Brady context, we call prejudice and materiality the same. It's the same prong.  Where is it? Yes. And Bouguered was a crucial witness, as the government said, to the enterprise element of RICO and to show that these little drug dealers were actually participating in the conduct of the enterprise, which was a requirement for the RICO case. For the drug conspiracy, there was one conspiracy. There's one giant conspiracy as opposed to all of these Bruno Vasquez or Julio Rosso, who's drug dealing with one of the appellants. This evidence was critical to establishing this unified one singular conspiracy as opposed to these little multiple conspiracies. Did Mejia have prior drug trafficking convictions? Sorry, I want to get the right Mejia. Yeah, sorry.  Sergio Mejia who's serving, yes, he's serving a life sentence based on 851 convictions. I asked whether he had prior drug trafficking convictions. That's what I meant to ask. Yes, because that's the basis of that life sentence. I don't know exactly what the qualifiers were, if they were trafficked. I mean, I don't represent him, but I'm assuming they were some kind of sales. So you're just telling me, yes, he had a predicate prior, but okay. Yes, yes. He has a predicate drug prior that qualified him for the 851 enhancement. So those are the two life sentence defendants are there for that reason. I think the main point I want to leave us with is just that the defense didn't get to do that all-out assault on this witness that Kyles B. Whitley talks about. It had like these little opportunities to chip away at his credibility, but they didn't get to make that assault that they could have done knowing that he was working as a paid informant whose motivation was profit. So, counsel, we know the difference between the NAPU standard and the Brady standard, and you just said could have done. And I appreciate what you're talking about. Had you had this information, you have to show what would it have made a difference. So what's your very best answer to Judge Smith's question about materiality? I mean, I think the top five things are how the prosecutor described the evidence, how the prosecutor argued it in closing, and how the defense argued it in closing, and also how this court decided it last time because the government's making the same arguments, again, this time, that it made in the first case. Well, the prior panel had a very different understanding of what was going to surface after the investigation. So I'm not sure that's the most persuasive, but I'm following your arguments. That's number three. And then the fourth thing is to really look at the enterprise element of racketeering and the entire conspiracy on count three. So, you know, I think it's counts one, two, and three that we're really focused on. Okay, and your position is that he was critical for that, for those three counts? Yes, exactly. All right. As well as for the sentence. Anything further from either of my colleagues? No. Not for me. Thank you both for your argument. We appreciate it very much. We'll take that case under advisement, and that will be a wrap for the week. So we'll stand in recess. Thank you. All rise. This court for this session stands adjourned.
judges: SMITH, CHRISTEN, FORREST